753 A.2d 192 (1999)
332 N.J. Super. 278
NEW JERSEY CONSERVATIVE PARTY, INC., a non-profit corporation of the State of New Jersey; Leonard P. Marshall, individually and on behalf of others similarly situated; Hovey Best, individually and on behalf of others similarly situated; and Ivan Smollen, individually and on behalf of others similarly situated, Plaintiffs,
v.
John J. FARMER, in his capacity as the Attorney General of the State of New Jersey; New Jersey State Republican Committee, a non-profit corporation of the State of New Jersey; New Jersey Democratic State Committee, a non-profit corporation of the State of New Jersey; Michael J. Garvin, in his capacity as the Atlantic County Clerk; Kathleen A. Donovan, in her capacity as the Bergen County Clerk; Michael Conda, in his capacity as the Burlington County Clerk; James Beach, in his capacity as the Camden County Clerk; Angela F. Pulvino, in her capacity as the Cape May County Clerk; Gloria Noti, in her capacity as the Cumberland County Clerk; Patrick J. McNally, in his capacity as the Essex County Clerk; James Hogan, in his capacity as the Gloucester County Clerk; Janet E. Haynes, in her capacity as the Hudson County Clerk; Dorothy K. Tippok, in her capacity as the Hunterdon County Clerk; Catherine DiCostanzo, in her capacity as the Mercer County Clerk; Elaine Flynn, in her capacity as the Middlesex County Clerk; M. Claire French, in her capacity as the Monmouth County Clerk; Alfonso W. Scerbo, in his capacity as the Morris County Clerk; M. Dean Haines, in his capacity as the Ocean County Clerk; Ronni Nochimson, in her capacity as the Passaic County Clerk; John W. Cawman, in his capacity as the Salem County Clerk; R. Peter Widin, hereinafter Somerset County Clerk; Erma Gormley, in her capacity as the Sussex County Clerk; Joanne Rajoppi, in her capacity as the Union County Clerk; Terrance D. Lee, in his capacity as the Warren County Clerk, Defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided October 13, 1999.[1]
*194 Eugene M. LaVergne, Long Branch, for plaintiffs.
John J. Farmer, Jr., Attorney General of the State of New Jersey (Donna Kelly, Senior Deputy Attorney General, appearing).
John E. Harrington, Medford, for the New Jersey State Democratic Committee.
Graham, Curtin & Sheridan (Peter G. Sheridan, appearing), Morristown, for the New Jersey State Republican Committee.
Carbone & Faasse (John M. Carbone, appearing), Ridgewood, for the Clerks of Bergen, Cape May and Somerset Counties.
Cassidy, Messina & Laffey (Gil D. Messina, appearing), Holmdel, for the Clerk of Monmouth County.
Paul J. Gallagher, Bedminster, for the Clerk of Atlantic County.
Jean Hartman Culp, Mount Holly, for the Clerk of Burlington County.
David J. Eddowes, Bridgeton, for the Clerk of Cumberland County.
Oury & Mizdol, P.C. (Dennis J. Oury, appearing), Hackensack, for proposed intervenor Bergen County Democratic Organization.
Genova, Burns & Vernoia (Angelo J. Genova, appearing), Livingston, for Essex County Democratic Organization.
No other appearances.
FISHER, P.J.Ch.

I

THE ISSUE
Initially, plaintiffs argued the major political parties failed to accumulate sufficient votes in the 1999 primaries to secure the exclusive right to the first and second ballot columns for the 1999 general election. Ultimately, the Appellate Division disagreed, rejecting this court's earlier ruling in favor of plaintiffs.[2] Changing course, plaintiffs now claim their exclusion from the lottery for the preferred ballot positions is unconstitutional. Because exclusion from the lottery, at best, only impacts plaintiffs' ability to obtain the mythical "windfall" vote, the claim lacks constitutional dimension and will be dismissed.

II

PROCEDURAL HISTORY
Plaintiffs' verified complaint alleged the Republican and Democratic parties failed *195 to gain the votes required by N.J.S.A. 19:5-1 at their 1999 primaries, rendering them eligible for the exclusive right to either the first or second columns on the ballot for the 1999 general election. Plaintiffs immediately sought to restrain the 21 county clerks from conducting the statutorily-required lottery for ballot position. For reasons expressed in a written opinion dated August 12, 1999, that application was denied. However, because that question only called for a legal determination as to the particular meaning of N.J.S.A. 19:5-1, the court provided defendants with a greater opportunity to respond than previously existed. Another hearing was scheduled and numerous legal memoranda were submitted. The arguments of counsel were heard and a written decision rendered on August 23, 1999. The court then found the Republican and Democratic Parties had failed to obtain a sufficient number of votes at their 1999 primaries to be eligible for the drawing for the first column on the ballot. This conclusion was reached because it was found the primary votes relevant for ascertaining whether N.J.S.A. 19:5-1's threshold had been met were only those cast for candidates for the General Assembly and not those for other offices. Accordingly, the county clerks were enjoined from acting inconsistently with that interpretation in preparing the ballots for the 1999 general election.
The Appellate Division granted the Attorney General's motion for leave to appeal and reversed. The Appellate Division rendered a brief memo decision on August 27, 1999 and followed that with a written opinion on September 3, 1999. 324 N.J.Super. 451, 735 A.2d 1189 (App.Div.1999). The Supreme Court of New Jersey denied plaintiffs' motion for leave to appeal on September 8, 1999.
On September 14, 1999, this court entered an order to show cause upon the application of plaintiffs. No immediate restraints were then sought or granted. The order required defendants to show cause why an order should not be entered (1) declaring N.J.S.A. 19:14-12 unconstitutional,[3] (2) restraining and enjoining enforcement of that statute by the 21 county clerks, and (3) directing the county clerks to provide all candidates with an equal opportunity to obtain the first column on the ballot. Another flurry of briefs arrived and were considered.[4]

III

THE CONSTITUTIONAL CHALLENGE
Having failed to convince the Appellate Division that their interpretation of N.J.S.A. 19:5-1 was correct, plaintiffs now grandiosely contend their exclusion from the lottery for ballot position "infringes upon a voters [sic] ability to cast a meaningful and fully weighted vote in violation of the `one manone vote' rule." That claim is patently flawed. What is impacted by the process referred to in N.J.S.A. 19:14-12 is not the ability of the voters to cast a meaningful vote but *196 whether plaintiffs should have an equal opportunity to obtain meaningless votes.
The parties to this case, at earlier hearings, appeared to have recognized an advantage to obtaining the first column on the ballot. Plaintiffs have also referenced various passages from the court's earlier opinions suggesting that securing one of the first two columns constituted a preference. The court may have then assumed that to be true for the purposes of its earlier decision. That issue, however, was never previously decided and did not then need to be decided. Moreover, that all parties may concede there to be an advantage in obtaining the first column is also not binding upon this court.[5]
Plaintiffs believe there is an advantage in securing the first column on the ballot (that is, the column on the far left), claiming there are voters who go to the polls and pick, without thought or reason, the candidates whose names appear to the far left of the ballot. Belief in the existence of this irrational voting phenomenon is apparently commonly held by politicians. It is based on the notion that "the candidate occupying the first position on the ballot will receive a substantial number of the `extra' votes from voters who are either uninformed or uninterested in the candidates and habitually select the first name on the ballot." New Alliance Party v. New York State Board of Elections, 861 F.Supp. 282, 287 (S.D.N.Y.1994), quoting Ulland v. Growe, 262 N.W.2d 412, 414 (Minn.), cert. denied sub nom. Berg v. Growe, 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978). This alleged curiosity has been labeled in the scant case law on the subject as the "windfall" vote or, more colorfully, the "donkey" vote. See also, McLain v. Meier, 637 F.2d 1159 (8th Cir.1980); Clough v. Guzzi, 416 F.Supp. 1057 (D.Mass.1976) (three-judge court); Libertarian Party of Colorado v. Buckley, 8 F.Supp.2d 1244 (D.Colo.1998); Graves v. McElderry, 946 F.Supp. 1569 (W.D.Okla.1996); Gilmore v. Gardner, 1994 WL 529922 (D.N.H.1994).
Despite plaintiffs' urging to the contrary, the meaningful votes of the electorate are not impacted by the Legislature's regulations concerning the creation of ballots. Those voters who read and think, or care, in even the slightest way, about what to do with their voteother than throw it awaywill be able to find their candidates. It is noted that the unofficial draft of the ballot prepared by the Clerk of Monmouth County, which was included in the parties' submissions, utilizes only four columns for the 1999 general election. The Republican party candidates (having won the lottery) *197 are in the first column, the Democratic candidates in the second column and the Conservative Party candidates are in the third column. Two Libertarian Party candidates for the Board of Chosen Freeholders appear in the fourth column. Nothing else appears in any other column. Accordingly, this is not a case where confusion caused by the configuration of the ballot could possibly be alleged. Voters desirous of voting for Conservative Party candidates will have no trouble finding them on the ballot. They appear, at least in Monmouth County, immediately to the right of the Democratic candidates and are plainly identified in a manner identical to the way in which the Republican and Democratic candidates are identified. Thus, plaintiffs' challenge to N.J.S.A. 19:14-12 cannot be based upon a right to an equal chance to garner "confused" voters. It also cannot be based upon a right to an equal chance to garner "disenfranchised" voters, i.e., those voters who are dissatisfied with the major parties and will therefore cast their votes for professional wrestlers or whoever else might appear on the ballot besides Republicans and Democrats. Indeed, this claim does not even seek an equal chance to attain votes which are cast for a variety of factors other than the issues, or the integrity of the candidates, or the political parties which have chosen them to run. Citizens no doubt cast votes for many reasons having nothing to do with the issues or the candidates. However, regardless of what factorvalid or whimsicalmay be considered by a voter, no confusion will be created by any ballot having the appearance of the ballot described above. We are, thus, only now considering the impact the exclusion of plaintiffs from the lottery for the first column will have on those votersassuming there are anywho have no conscious thought when stepping into the voting booth.
In short, stripped down to its essentials, plaintiffs seek an equal chance to obtain the votes of fools, namely, those voters who cast a vote without any reason or rationale at all. To succeed, plaintiffs have to show, first, there are any such voters or that there are more than a mere trifle of such voters. Plaintiffs must also demonstrate that the Legislature's method of governing the manner of elections, and its impact upon this so-called "windfall" vote, is violative of the standard of scrutiny required by the federal constitution.[6] Plaintiffs' claim fails on all levels.
"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). This right has been clarified to mean, in essence, "the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Subsumed within this right is the power of the state to regulate elections to "ensure orderly, rather than chaotic, operation of the democratic process." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). That state interest has been defined as not a legitimate interest but rather "a compelling interest." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Accordingly, state regulations in this area will not be deemed unconstitutional unless a state restriction, without compelling justification, significantly encroaches upon the right to vote and the right to associate for political purposes. In its most recent description of the analysis that must be followed, the Supreme Court of the United States said:
When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we *198 weigh the "character and magnitude" of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concern makes the burden necessary. Regulations imposing severe burdens on plaintiff's rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's "important regulatory interests" will usually be enough to justify reasonable, nondiscriminatory restrictions. No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms.
Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). As analyzed above, the only injury which plaintiffs can possibly claim is their alleged inability to equally compete with the Republican and Democratic parties for the "windfall" vote. The court in New Alliance said of a similar claim:
[The challenger to the system] has suffered no injury to its constitutional rights. It does not claim to have been excluded from the ballot or to have been unable to fairly obtain access to the ballot. The State has in no way prevented [the challenger] from making its views known to the public or prevented its supporters from voting for the candidate of their choice. All that plaintiff really alleges is that its opportunity to capture the windfall vote has been impeded. While access to ballot may, at times, be afforded constitutional protection, access to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern. Indeed, it should not be. The Constitution does not protect a plaintiff from the inadequacies or the irrationality of the voting public; it only affords protection from state deprivation of a constitutional right. "Voters have no constitutional right to a wholly rational election, based solely on a reasoned consideration of the issues and the candidates' positions, and free from other `irrational' considerations as a candidate's ethnic affiliation, sex, or home town."
New Alliance, supra, 861 F.Supp. at 295 (emphasis added) (quoting Clough v. Guzzi, supra, 416 F.Supp. at 1067). This court agrees with, and cannot improve upon, the analysis of Judge Ward in New Alliance and, for those reasons, can find no basis for affording protection to the urged right to an equal opportunity to acquire the alleged "windfall" vote. See also, Sonneman v. State, 969 P.2d 632 (Alaska 1998); Koppell v. New York State Bd. of Elections, 8 F.Supp.2d 382 (S.D.N.Y.), aff'd 153 F.3d 95 (2d Cir.1998).[7]
Indeed, as in New Alliance, there is no evidence in this case of an appreciable correlation between ballot placement and the extent to which placement will impact upon the ability to acquire irrational votes. Again, it is not enough for this court to observe that many or all of the defendants believe that the "windfall" vote even exists or will be cast only for candidates whose names are in a particular location on the ballot. Their belief alone is insufficient to form the framework for the creation of such a right. If the plaintiffs and defendants believed in the legitimacy of the Easter Bunny, this court would not be required to find as a fact (or through judicial notice) that such a creature truly exists. The court, notwithstanding any express or implied concession from plaintiffs and defendants, is obligated to scan the factual record in this case and learn from the experiences of other courts in other similar cases to determine whether a correlation *199 between ballot placement and the disproportionate gathering of irrational votes truly exists. In that regard, the court has been presented with nothing and has found nothing which would suggest there are voters who simply go to the polls and vote senselessly.
In suggesting otherwise, plaintiffs only misguidedly refer to the laws and authorities of other states which gave incumbents the right to the first column. See, e.g., "California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents," 45 So.Cal. L.Rev. 365 (1972); "Position of Candidates' Names and Special Designations on Ballots: Equal Protection Problems With the Massachusetts Election Law," 9 Suffolk L.Rev. 694 (1975). The opening sentences of both those law review articles demonstrates that the criticism of the laws of California and Massachusetts contained therein relate to an entirely different matter.[8] There may very well be an advantage to being an incumbent but the statistical analyses contained in those articles and elsewhere have been convincingly refuted by other commentators. As said in one article, "[c]ontrary to much popular opinion and several earlier studies, first place on a ballot gives a candidate no advantage. One of the primary reasons for this discrepancy between our data and some of the earlier works, we suspect, stems from the failure to disentangle the effects of incumbency from the effects of ballot position." Byrne & Pueschel, "But Who Should I Vote for for County Coroner?," 36 Journal of Politics 778, 781 (1974). Because our election laws give no advantage to incumbents, plaintiffs reliance upon these authorities seems pointless.
That there is voter apathy and a malaise creeping in our electoral process may be assumed for the moment. The expected consequence of such a condition, however, would be an increasing number of registered voters staying home on election day. The poor turnout in the Republican and Democratic primaries in 1999 referred to in the earlier proceedings appears to support the existence of growing voter indifference. But it is an odd act of indifference for a voter to take the trouble of going to the polls only to then cast a vote without thought; this court, in the absence of clear proof, prefers to believeperhaps naivelythis windfall vote simply does not exist. The apathetic or indifferent may, and no doubt do, stay away from the pollslately in drovesbut nothing before the court suggests they do show up at the polls in order to vote in an unguided fashion. The existence of such irrational voting, proof of which is critical to the success of plaintiffs' claim, should not be ascertained through what some or even all of the litigants believe to be self-evident or by what they have conceded or by which law review article they believe is more convincing. The issue should be decided by persuasive empirical evidence. In this case no admissible evidence has been submitted on this particular factual contention, only speculation. Indeed, plaintiffs submitted no affidavits or certifications of any kind in support of the order to show cause. Accordingly, the linchpin to plaintiffs' argumentthat being in the first or second column, instead of the third column, has significance on election dayis utterly absent from the record in this case.

IV

CONCLUSION
The court finds that plaintiffs' attack on the constitutionality of N.J.S.A. 19:14-12 *200 fails to state a claim upon which relief may be granted. State regulation which might have the unforeseen effect of giving candidates of certain political groups a better opportunity to gather irrational votes than candidates of other political groups is not constitutionally infirm. The federal constitution only provides remedies against those state regulations which infringe upon the integrity of the democratic system. The First and Fourteenth Amendments do not require the enactment of laws which provide an equal opportunity for candidates for office to obtain the votes of those citizens who would cast those votes in an unconscious manner. New Alliance, supra, 861 F.Supp. at 295. Accordingly, the claim referred to in the order to show cause will be dismissed. There being no other viable causes of action contained in the complaint or otherwise urged, final judgment will be entered dismissing the action.
NOTES
[1] The matter was originally decided by an oral opinion on October 12, 1999.
[2] The prior proceedings in this case are described in this court's written opinion of August 23, 1999 and the Appellate Division's opinion of September 3, 1999. The latter is reported at 324 N.J.Super. 451, 735 A.2d 1189.
[3] N.J.S.A. 19:14-12 is quite lengthy and will not be extensively quoted. Of relevance to the present inquiry is that this statute directs the county clerks to draw "lots" to "determine which columns the political parties which made nominations at the next preceding primary election shall occupy on the ballot in the county. The name of the party first drawn shall occupy the first column at the left of the ballot, and the name of the party next drawn shall occupy the second column, and so forth. The position which the names of candidates, and bracketed groups of names of candidates nominated by petitions for all offices, shall have upon the general election ballot, shall be determined by the county clerks in their respective counties." In short, only political partiesat present the Republican and Democratic Partiesare entitled to be in the lottery for the first or second columns. All other candidates nominated by petition, at the discretion of the clerks, are placed in the columns following the second column.
[4] That part of the court's opinion which rejected defendants' various issue and claim preclusion arguments has been eliminated for purposes of publication of this opinion.
[5] To digress, it is interesting that plaintiffs do not urge the unconstitutionality of N.J.S.A. 19:5-1 as it is now interpreted by the Appellate Division. Such an argument might have been expected since the formula for retaining the right to the first column on the ballot will widely vary from year to year and could be argued, for that reason, to be irrational. That is, the threshold figure which must be met each year is clearly and unambiguously stated in N.J.S.A. 19:5-1 to be 10% of the votes cast for the General Assembly in the preceding general election. Now, according to the Appellate Division's controlling decision, whether that threshold has been met depends upon the number of votes cast in all the primary races, including local elections, statewide elections, national elections and, in light of the incorporation by the Appellate Division of the phrase "any election," even school board elections. Accordingly, the relative ease or difficulty of a political party to meet that 10% figure will vary from primary to primary depending upon the number of candidates and offices included in that process. So that, in one year there may be only two or three candidates for which a primary voter may cast a vote, and in another year there may be seven or eight or more. Since N.J.S.A. 19:5-1 is not applied by counting voters or even votes for the General Assembly, but includes all votes for all primary races, the ability to meet or exceed the 10% figure will greatly vary from year to year. Whether that is an arbitrary or irrational way of determining whether a political party has made a sufficient showing at a primary to retain political party status, and whether that method is thus violative of either our federal or state constitutions, would certainly appear to be a colorable argument. It is not, however, an argument raised in this action. Accordingly, this court intimates no other view on that subject.
[6] Plaintiffs have not argued that any provision of our State's constitution has been violated in any way and this court intimates no view of whether there are more expansive state constitutional rights in this area than there are federal constitutional rights.
[7] In fact, at least for the 1999 election, the Conservative Party is hardly more disadvantaged in this regard than the lottery losers. If there really is a "windfall" vote and if it is acquired only by the party in the first column, is there a greater advantage to being in the second column than the third?
[8] The first cited article starts: "In most California elections the name of the incumbent appears first on the ballot. This Note presents a statistical study which demonstrates that the candidate whose name appears first in the list of candidates is the beneficiary of a substantial positional bias." 45 So.Cal.L.Rev. at 365. The second cited article starts: "The Massachusetts scheme of ordering the names of candidates on election ballots favors incumbents, members of the Governor's party, and candidates whose surnames fortuitously begin with letters from the beginning of the alphabet." 9 Suffolk L.Rev. at 694.