130

THE STATE, EX REL. ROOF ET AL., APPELLANTS, *v.* BOARD OF
COMMISSIONERS OF HARDIN COUNTY ET AL., APPELLEES.

[Cite as State, ex rel. Roof, v. Bd. of Commrs. (1974),
39 Ohio St. 2d 130.]

(No. 73-264—Decided July 17, 1974.)

*Mr. Carlos A. Faulkner* and *Mr. John L. Roof*, for appellants.

*Mr. James L. Crates*, prosecuting attorney, for appellees Board of Commissioners and Auditor of Hardin County.

*Mr. William J. Brown*, attorney general, and *Mr. Michael R. Grove*, for appellee Secretary of State.

O'Neill, C. J.   In the Court of Appeals, this case presented three issues for that court to decide; those issues, and a summary of this court's disposition of each in the present review, are as follows:

1. Is the rotational provision of R. C. 3507.07 constitutional?   That question can be summarily disposed of by this court.   After the Court of Appeals decided this case the General Assembly repealed R. C. 3507.07.   Therefore, the constitutionality of R. C. 3507.07 is moot.

2. Do the self-executing provisions of Section 2a, Article V of the Ohio Constitution, assert that the only system of rotation of names of candidates upon voting machine ballots that is constitutionally valid is a system which establishes perfect rotation[2] in every precinct, in every political subdivision?   Appellants answer this question in the affirmative and argue in brief that the only system of rotation of candidates' names on a ballot which is constitutional under Section 2a, Article V, is that system which most closely approximates perfect rotation (*i. e.*, a paper ballot system).

---

[2]"Perfect rotation" can be defined as rotation of the names of candidates for each office in such a manner that every name will be seen by an equal number of voters at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs.

It is apparent that absolute perfect rotation will rarely, if ever, be attained by any method of rotation.   For example, even in the simplest type of election—two candidates, one precinct—even if the names of the candidates are alternated as to each new voter, perfect rotation will occur only if an even number of electors turn out.   This discrepancy will increase as the number of candidates in a race and the number or precincts involved increases.   The phrase "perfect rotation," as used in this opinion, includes this slight imperfection inherent in the system.

This court holds that Section 2a, Article V of the Ohio Constitution does not absolutely prohibit the use of voting machines.

3. Does the system of precinct-by-precinct rotation of candidates' names on voting machine ballots used in Hardin County comply with the provisions of Section 2a, Article V of the Ohio Constitution? This court holds that although the Constitution does not prohibit the use of voting machines, it does require that among the various methods of machine rotation that are economically and administratively feasible, the only method that may be utilized is the one which most closely approaches perfect rotation. Precinct-by-precinct rotation does not comply with this requirement and is, therefore, unconstitutional.

*I.*

In November 1949, the voters of this state amended the Ohio Constitution by adopting Section 2a, Article V, the "office type ballot" constitutional amendment. The major change effected by the amendment, which applies to general elections only, was stated in the last sentence thereof:

"An elector may vote for candidates (other than candidates for electors of President and Vice-President of the United States) only and in no other way than by indicating his vote for each candidate separately from the indication of his vote for any other candidate."

In general elections held prior to the effective date of Section 2a, Article V, an elector could cast his vote for each and every candidate of a specific political party by simply making a mark in the appropriate space on the ballot. G. C. 4785-105 (113 Ohio Laws 307, 355).

The layout of the "office type ballot" is specified by Section 2a, Article V:

"The names of all candidates for an office at any general election shall be arranged in a group under the title of that office. * * *"

Therefore, after 1949 an elector desiring to cast a vote for a particular office being voted upon at a general election had to locate that office on the ballot and then choose a candidate from a list of names.

The drafters of Section 2a, Article V, foresaw that this new voting procedure could result in group-position bias, for it is generally agreed that if a person desires to cast a vote for a particular office, but can do so only by choosing a candidate from a list of names, those candidates whose names appear at the beginning of the list receive some votes attributable solely to the positioning of their names.[3] In an attempt to neutralize this factor, Section 2a, Article V, requires that the names of all candidates for any office voted upon at a general election "be so alternated that each name shall appear (in so far as may be reasonably possible) substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs."

It is this rotational provision that has engendered the instant lawsuit. Appellants contend that the rotational requirement contained in Section 2a, Article V, mandates that at general elections the only permissible method of voting is that method which will most closely achieve perfect rotation.

Paper ballots, printed and combined into tablets pursuant to R. C. 3505.03 and distributed to voters in the manner specified by R. C. 3505.18, achieve perfect rotation. For voting machines to achieve the same degree of rotation,[4] each precinct would have to contain the same number of machines as there would be paper ballots in a tablet compiled under the directives of R. C. 3505.03. That is, each precinct would have to contain that number of machines equal to the least common multiple of the number of names

---

[3]Group-position bias has been documented in several studies. See Note, California Ballot Position Statutes: An Unconstitutional Advantage To Incumbents, 45 S. Cal. L. Rev. 365 (1972), and the authorities cited therein at footnote 4.

[4]The record discloses that the type of voting machine involved in this case is unable to rotate candidates' names for each voter utilizing the same machine. There is no evidence that any type of voting machine now in existence can so rotate names. Therefore, this court expresses no opinion on the legal significance of the development and marketing of such a voting machine.

in each of the several groups of candidates appearing on the ballot. The position of the candidates' names would have to be rotated from machine to machine in the same manner as rotation of names on each of the several ballots that make up a tablet of paper ballots under R. C. 3505.03. The machines would have to be ranked in a definite order and utilized in regular serial sequence by the voters.

It is obvious that the financial, spatial and supervisory problems that would be generated by requiring such a procedure as a prerequisite to the use of voting machines would effectively terminate the use of such machines at general elections. This result would be contrary to public policy favoring the use of voting machines at all elections. This public policy existed in Ohio both before and during the period in which the "office type ballot" constitutional amendment was presented to and adopted by the people.

The use of voting machines in Ohio was first authorized by R. S. 2966-54 *et seq.* (93 Ohio Laws 277), enacted in 1898. However, in *State, ex rel. Karlinger, v. Bd. of Deputy State Supervisors of Elections* (1909), 80 Ohio St. 471, 89 N. E. 33, a divided court declared the 1898 Act unconstitutional as in conflict with Section 2, Article V of the Ohio Constitution, which states that "all elections shall be by ballot." The majority, at page 490, reasoned that the word "ballot" connoted only a paper ballot "prepared or adopted by each individual voter and passing by the act of voting from his exclusive control into that of the election officers, to be by them accepted as the expression of his choice."

The *Karlinger* case was expressly overruled in *State, ex rel. Automatic Registering Machine Co., v. Green* (1929), 121 Ohio St. 301, 168 N. E. 131, which held that the term "ballot" in Section 2, Article V, designated a method of secret voting, as distinguished from open or voice voting. The General Assembly quickly re-authorized the use of voting machines by enacting G. C. 4785-161 *et seq.* (113 Ohio Laws 307, 382), effective January 1, 1930. Statutes permitting the use of voting machines have been in force in this state from that day until the present. Hence, for 19

138

years prior to the adoption of Section 2a, Article V, the use of voting machines was approved by statute. These statutes were in effect during the time Section 2a, Article V, was drafted, considered and finally approved by the voters of this state.

This public policy which was enacted by statute in Ohio is grounded upon four sound reasons: (1) Voting machines eliminate the fraud in voting which occurs in the use of paper ballots. (2) Voting machines provide a much faster count for the information and convenience of the public than was provided with paper ballots where the booth workers must handle each ballot and record separately each ballot in making the count. (3) Voting machines provide a much more accurate marking of the ballot than is possible with paper ballots where an "X" must be made for the favorite candidate for each office by hand. (4) Voting machines provide an accurate record of each vote, and prevent the spoilage of ballots that occurs in the use of paper ballots.

If the rotational provision contained in Section 2a, Article V, terminated the public policy favoring the use of voting machines, it did not expressly do so. Therefore, to adopt appellants' interpretation concerning the effect of the rotational provision on the use of voting machines would require a holding that Section 2a, Article V, repealed by implication those statutes authorizing such use. This court, although recognizing the doctrine of repeal by implication, has always been wary of applying it, as stated in the second paragraph in the syllabus of *State* v. *Cameron* (1914), 89 Ohio St. 214, 106 N. E. 28:

"Repeals by implication are not favored, and before a statute is so repealed the repugnancy must be necessary and obvious, and if by any fair course of reasoning the law and Constitution can be reconciled the law must stand. (*Cass* v. *Dillon,* 2 Ohio St. 608, approved and followed.)"

If Section 2a, Article V, flatly required perfect rotation, there would be a "necessary and obvious" conflict between the Constitution and statutes permitting the use of the voting machines which cannot, individually, be made

to rotate the names of candidates for each voter. However, Section 2a, Article V, clearly does not require perfect rotation. The phrasing in the Constitution, that each name in a list of candidates appear "an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs," describes perfect rotation, but it is modified by the word "substantially."

If the rotational provision of Section 2a, Article V, were given the comparative interpretation appellants seek, then the only method of voting permissible at general elections would be that method which most closely approximates perfect rotation. Since voting machines can not achieve the same degree of rotation possible under paper ballots, use of such machines at general elections would be unconstitutional. That Section 2a, Article V, does not dictate such a rule can be deduced from the parenthetical remark that immediately precedes the "substantially an equal number of times" phrase. This remark states that the "substantially an equal number of times" result is required "only in so far as may be reasonably possible." Since the constitutional provision describing perfect rotation is qualified by the word "substantially," it can be inferred that the parenthetical phrase was meant to convey a different concept. It is not unreasonable to assume that the parenthetical phrase was inserted to express the intent of the drafters of Section 2a, Article V, that the requirement of substantial neutralization of group-position bias need be achieved only in so far as reasonably possible within the framework of those methods of voting which comply with the directive of Section 2, Article V, that voting be by ballot.

Guided by public policy and the modifying language contained in Section 2a, Article V, this court is led to reject appellants' contention that the rotational provision contained therein established a constitutional requirement that only that method of voting which most closely achieves perfect rotation may be used in general elections. The

use of voting machines is not absolutely prohibited by Section 2a, Article V.

This court's holding that the rotational provision contained in Section 2a, Article V, does not prohibit the use of voting machines at general elections is also indicated by the probable source of that language. Long before Section 2a, Article V, was adopted, the General Assembly recognized that group-position bias must be recognized as a factor whenever an election is conducted in such a manner that the only method of casting a vote for a particular office is to vote for a specific candidate, as opposed to voting for a particular party. Hence, in 1939 rotation of candidates' names was required at primary elections by G. C. 4785-80 (113 Ohio Laws 307, 343), and in nonpartisan contests by G. C. 4785-101 (113 Ohio Laws 307, 353). In that year, G. C. 4785-161e was amended to require that in those areas using voting machines:

"The names of candidates required by law to be rotated alphabetically shall be rotated by precincts in regular serial sequence so that each name of a list or group of candidates for an office shall appear upon the several voting machines used at the election, an equal number of times, as nearly as practicable, at the top, at the bottom and in each intermediate place, if any, under the title of the office sought. * * *" (118 Ohio Laws 223, 238.)

In 1949, realizing that group-position bias would be a factor at general elections in which office-type ballots were utilized, the drafters of Section 2a, Article V, sought to offset this factor by incorporating into the Constitution, with minor changes, the language contained in G. C. 4785-161e describing the desired result of rotation. It would be illogical for this court to hold that the transference to Section 2a, Article V, of the language contained in G. C. 4785-161e, admittedly a statute pertaining solely to voting machines, would have the effect of rendering unconstitutional the continued use of such machines.

*II.*

Although the use of voting machines is not absolutely

prohibited by Section 2a, Article V, that provision clearly requires some system of rotation of candidates' names when voting machines are utilized in general elections. However, the General Assembly or election officials are not free to implement any system of voting machine rotation which they deem proper. This court has previously indicated that when paper ballots are utilized in general elections, and the evidence discloses that perfect rotation "can be had within reasonable limits of expense, mechanical effort, and practicality of operation," a statute which provides for less than perfect rotation would be unconstitutional. *State, ex rel. Russell,* v. *Bliss* (1951), 156 Ohio St. 147, 150, 101 N. E. 2d 289. It has already been noted that when voting machines are utilized, perfect rotation as to every race can not be obtained "within reasonable limits of expense, mechanical effort, and practicality of operation." However, among the remaining systems of voting machine rotation, the *Bliss* case stands for the proposition, which this court herein adopts, that the only permissible system is that one which, within reasonable limits of expense, mechanical effort and practicality of operation, most closely approximates perfect rotation.

When this case was instituted, R. C. 3507.07 mandated precinct-by-precinct rotation of candidates' names in those localities using voting machines. The subsequent repeal of that statute renders its effect on this case moot. A new rotational statute has not been enacted by the General Assembly. Additionally, there is nothing in the record to indicate that the Secretary of State, pursuant to R. C. 3507.-15, has promulgated a rotational regulation that will apply in future general elections.

The lack of statutory or administrative guidelines governing the rotation of candidates' names on voting machines used in general elections does not limit the authority of this court to rule on the constitutionality of the only method of voting machine rotation portrayed by the record of this case—precinct-by-precinct rotation. This court has held that the rotational provision of Section 2a,

Article V, is self-executing, thereby "making unnecessary any repetitive or enabling legislation." *State, ex rel. Russell,* v. *Bliss, supra,* at 152. See, also, *State, ex rel. Wesselman* v. *Bd. of Elections* (1959), 170 Ohio St. 30, 162 N. E. 2d 118.

The vast majority of state and county races voted upon at general elections in this state involve only one or two candidates.[5] There would, of course, be no rotational problem in the uncontested races. However, precinct-by-precinct rotation of candidates' names on voting machines fails to eliminate group-position bias in the two-candidate races for two reasons. First, if the county contains an odd number of precincts—as Hardin County did at the commencement of this action—one candidate's name will appear on top and another candidate's name will appear on the bottom on all the ballots in one more entire precinct than will his opponent's name. This would also be true in any two-candidate election held in one or more of the smaller political subdivisions within a county where there was an odd number of precincts in the territorial area. Second, the record demonstrates a great disparity in the number of electors voting in the different precincts of the county. The spread is from a low of 122 to a high of 564. Thus, those candidates whose names appear at the top of the list in precincts in which there is a heavy turnout of voters receive a far greater benefit from group-position bias than do their opponents who appear at the top of the list in precincts in which there is a low voter turnout.

A system of voting machine rotation is possible which will not only attain perfect rotation in all one- and two-

---

[5]An examination of the official publications of the Secretary of State, entitled "Ohio Election Statistics," for 1969-1970 and 1971-1972 demonstrates that in the 1970 general election for state and county offices, there were a total of 495 offices to be filled. In 466 of these races, which equals 94 percent of the total, there were only one or two candidates for each office.

In the 1972 general election, there was a total of 1,151 state and county offices to be filled by election. In 1,092 of these races, or 95 percent, there were only one or two candidates for each office.

candidate races, which comprise approximately 95 percent of all state and county races, but will also assure a greater degree of rotation in a three-or-more-candidates race than is possible under precinct-by-precinct rotation. Such a system would require that each precinct using voting machines have at least two, and, in any event, an even, as distinguished from an odd, number of voting machines. The names of candidates for all offices must then be alternately rotated on the machines within a given precinct. The names of candidates for those offices in which there are three or more candidates must be rotated not only from machine to machine within a given precinct, but such machine-to-machine rotation within a precinct must be continuous from one precinct to the next. Each succeeding elector must be directed to a machine different from the machine utilized by the preceding voter, and the various machines must be used in a regular serial sequence.

The above-described system of rotation will assure perfect rotation for all candidates in one and two-candidate races. This system will also secure a substantially greater degree of rotation for those candidates involved in a three-or-more candidate race than is possible under precinct-by-precinct rotation. The increase results from the requirement that every machine must be utilized in rotating candidates' names, not just the machines from one precinct to another. This court believes that the rotation possible under such a system of rotation does, in a race involving three or more candidates, comply with the rotational provision of Section 2a, Article V.

The two-machines-or-more-per-precinct (always an even number) system of voting machine rotation is financially and administratively feasible, and hence is in tune with the rotational provision of the Constitution which, although mandatory, is phrased in the language of reasonableness and practicality. Since this system achieves a much greater degree of rotation than is possible under precinct-by-precinct rotation, the precinct-by-precinct method of rotation is manifestly unconstitutional. If the use of

voting machines at general elections is to be continued in this state, the two-machines-or-more-per-precinct (always an even number) system of rotation must be implemented.

For the reasons stated in this opinion, the appeal from that part of the judgment of the Court of Appeals holding the rotational provision of R. C. 3507.07 constitutional is dismissed as moot. The precinct-by-precinct rotation procedure used in Hardin County, as portrayed by the record in this case, is held to be unconstitutional. That part of the judgment of the Court of Appeals, reversing the judgment of the Court of Common Pleas that voting machines can not comply with the self-executing rotational provision of Section 2a, Article V of the Ohio Constitution, is affirmed.

*Judgment accordingly.*

HERBERT, STERN and W. BROWN, JJ., concur.

CELEBREZZE and P. BROWN, JJ., concur in paragraphs one, two and three of the syllabus and in the judgment.

CORRIGAN, J., concurs in part and dissents in part.

CORRIGAN, J., concurring in part and dissenting in part. There is no way that I can justify associating myself with paragraph four of the syllabus and that part of the opinion and judgment dealing with mootness of R. C. 3507.-07. Accordingly, I join in paragraphs one, two and three of the syllabus and dissent from the remainder of the decision for the reasons appearing hereafter.

*I.*

Section 2a, Article V, which became effective in 1949, reads, in part:

"The names of all candidates for an office at any general election shall be arranged in a group under the title of that office, and shall be so alternated that each name shall appear (in so far as may be reasonably possible) substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs."

In *State, ex rel. Russell,* v. *Bliss* (1951), 156 Ohio St. 147, this court held that the above-quoted portion of Section 2a, Article V, is self-executing. In the course of that opinion, it was stated, at page 152, that:

"'* * * the constitutional provisions set out how the names of candidates shall be rotated on the ballots with such clarity that the form of the ballot is clearly prescribed, making unnecessary any repetitive or enabling legislation.''

Rotation of names on printed ballots is provided for in R. C. 3505.03, which reads, in part:

"The names of all candidates for an office shall be arranged in a group under the title of that office, and shall be so alternated that each name shall appear, insofar as may be reasonably possible, substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs.

"The method of printing and combining the ballots in tablets to meet the rotation requirements of this section shall be as follows: The least common multiple of the number of names in each of the several groups of candidates shall be used and the number of changes made in the printer's forms in printing such ballots shall correspond with such multiple. On the first series of ballots, the names of the candidates in each group of candidates shall be in alphabetical order. On each succeeding series, the names of the candidates in each group of candidates which is first in the preceding series shall be last and the names of each of the candidates in each group shall be moved up one place. The printed ballots shall then be combined in tablets by assembling series of ballots each consisting of one ballot of each series printed as described in this paragraph, assembled in the same consecutive order in which the series in which each ballot is a part was printed, dividing such assembled series of ballots in instances in which the total number of ballots in each series shall exceed the number of ballots required in a precinct and otherwise by combining as many of such assembled series of ballots as are

necessary to make tablets consisting of the number of ballots required for each precinct."

Where printed ballots, prepared and combined in accordance with R. C. 3505.03, are distributed to voters, successive voters receive ballots upon which the names of candidates are alternated. Printed ballots thus strictly conform to the requirements of Section 2a, Article V, in that the names of candidates are, in fact, so alternated that each appears "* * * in so far as may be reasonably possible * * * substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs."

A less perfect result obtains in the case of voting machines, where it is not possible to vary on each machine the order of the names of candidates presented to different voters. The method of rotation prescribed in former R. C. 3507.07[a]—rotation "by precincts in regular serial sequence."—accomplished some degree of rotation but it was obviously much less perfect than the alternation achieved where printed ballots are printed and combined pursuant to R. C. 3505.03.

The majority admits that the system of machine rotation which it finds permissible under Section 2a, Article V, does not assure perfect rotation where more than two candidates seek the same office. The qualification of the requirement of Section 2a that names of candidates appear "* * * substantially an equal number of times at the beginning, at the end, and in each intermediate place, if any, of the group in which such name belongs" by the phrase in parentheses "(in so far as may be reasonably possible)" certainly does not broaden that requirement so as to nullify it. In my opinion, the qualifying language should be construed to mean that the machine must alternate the names of candidates as substantially equally as that method of balloting which most closely approximates perfect rotation, i. e., the method set forth in R. C. 3505.03.

---

[a]R. C. 3507.07 was repealed by Section 2 of Amended Senate Bill No. 291, effective November 21, 1973.

The method of rotating candidates' names on the voting machines, as set forth in the majority opinion, by its failure to provide, "in so far as may be reasonably possible," the ballot positions to competing candidates prescribed in Section 2a, Article V, where there are more than two candidates, subverts both the letter and spirit of that constitutional provision.

Moreover, it is my persuasion that former R. C. 3507.07 violated the equal protection clause of the Fourteenth Amendment to the United States Constitution insofar as the interests of any competing candidates for election to public office were disadvantaged by the application of its provisions. Patently, it was purposely and invidiously discriminatory to the candidate whose name does not appear an equal number of times as that of every other candidate at the beginning of the group in which his name belongs on the ballot. As such, it constituted a denial of the civil rights of the disadvantaged candidate. And further, it lacked the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

*II.*

The majority note that R. C. 3507.07 was repealed by the General Assembly on November 1, 1973, and they blithely avoid the obvious constitutional infirmity of that section, as applied to the facts in this case, on the basis that it is now moot.

In fairness to the plaintiffs and their attorneys it must be pointed out that this is a taxpayer's suit initiated in the Court of Common Pleas in 1972. Due to their diligence and vigilance an unconstitutional use of these voting machines and further illegal expenditure of public funds, under favor of R. C. 3507.07, was enjoined in the trial court. The Court of Appeals erroneously reversed the trial court decision, and appeal from that judgment was lodged in this court in June 1973. Briefs were seasonably filed by the parties, and oral argument was heard in this court on October 10, 1973. During this entire period of time R. C. 3507.07 was in full force and effect, and the Board of Elections

of Hardin County, operating thereunder, used these unconstitutional machine ballots to the detriment of candidates and electors. Now, more than a year after we assumed jurisdiction pursuant to the granting of a motion to certify the record and after more than eight months of setting on the judicial nest, subsequent to oral argument, the court hatches a glass egg of mootness which was slipped into the nest on November 1, 1973. In all candor, the parties and the electors of Hardin County are entitled to our answer to the questions poised on the facts, as indisputably shown by the record, existing in the election process in their county prior to and during the pendency of this litigation. R. C. 3507.07 was unconstitutional when it was adhered to by the Board of Elections before November 1, 1973, and should be so declared. Paragraph two of the syllabus states the correct constitutional doctrine but does not pin-point that statute.

### III.

Worthy next, of more than passing notice, is paragraph four of the syllabus as fashioned by the majority. It inobtrusively ushers some new election law into our Ohio corpus juris by judicial fiat.

This court does not give advisory opinions, and the Secretary of State is the chief election officer of the state. In addition to these indisputable facts, paragraph four of the syllabus is not based on the record before us in this case. Paragraph four of the syllabus requires at least two machines in each precinct. To apply the time-honored principle of logic, *reductio ad absurdam*, let's take a backward look at what would have been required in Hardin County in the municipal elections of November 1973, under paragraph four, as pointed out in the reply brief of relator-appellants to supplemental brief:

"Since this is a municipal election, in which the 7 villages of the county will vote to elect 4 village councilmen from a list of from 3 to 9 candidates in various village elections, and in which Kenton City will vote for 3 councilmen-at-large out of a list of 6 candidates, even if there is not

an odd number of candidates for any other office, this will require from 4 to 8 machines in each single-precinct village, 68 more for the precincts in Ada and Forest and 6 machines in each of the eleven Kenton precincts, or a total of around 166 machines just for these 20 precincts, in order to rotate the 9, 8, 6, 4 or 3 names by sending each successive voter to a different machine. The other 16 precincts will require at least 28 machines for township elections, plus 4 more township machines for the 2 township-village combined precincts, or a total of around 194 voting machines in Hardin County, if voters are rotated from machine to machine in each precinct. Hardin County does not have and cannot afford that many."

If this machine ballot can only comply with constitutional requirements by the aid of intricate special laws, regulations, or judicial fiat, and vast numbers of machines, certainly it does not meet the requirements of this *self-executing* constitutional provision, which defines what the ballots shall do without reference to number of precincts, precinct size, number of electors to a precinct, number of *actual voters* using a particularly programmed machine or group of machines.

Any statute or administrative regulation or judicial fiat which has to set up such highly artificial methods to enable a type of ballot to comply with a self-executing constitutional provision oppugns the provision, and the former must give way to the Constitution.

The record before us demonstrates without question that printed ballots strictly conform to the literal constitutional requirements of Section 2a, Article V, and that the voting machines used in Hardin County do not achieve that constitutional result.