**Harley McLAIN, Appellant,**

v.

**Ben MEIER, Secretary of State and Allen Olson, Attorney General, Appellees.**

No. 80–1656.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 9, 1980.

Decided Oct. 21, 1980.

Rehearing Denied Oct. 28, 1980.

Stephen L. Pevar, American Civil Liberties Union, Denver, Colo., for appellant.

Brian R. Bjella, Asst. Atty. Gen., Bismarck, N. D., for appellees.

Before HENLEY and McMILLIAN, Circuit Judges, and VAN PELT, District Judge.*

HENLEY, Circuit Judge.

Harley McLain, an independent candidate for the United States Congress from North Dakota in the November, 1978 election, appeals the district court's [1], 496 F.Supp. 462, denial of declaratory and permanent injunctive relief, alleging that his constitutional rights under the first and fourteenth amendments have been violated by three of

---

* The Honorable Robert Van Pelt, United States Senior District Judge, District of Nebraska, sitting by designation.

1. United States District Court for the District of North Dakota, The Honorable Paul Benson, Chief Judge, presiding.

North Dakota's election laws. North Dakota Century code (hereinafter N.D.C.C.) §§ 16–04–20(4); 16–11–06; and 16–11–05(4).[2] McLain contends that both the ballot access and ballot format aspects of these statutes are unconstitutional.

The district court reviewed each of the statutes under the rational basis standard and concluded that they can withstand constitutional scrutiny. For reasons to be stated, we reverse in part and affirm in part.

## I. BACKGROUND

In summer, 1978 McLain organized the political group "Chemical Farming Banned," registering it with the Federal Election Commission.[3] He subsequently attempted to file as the group's party candidate for Representative in the United States House of Representatives, but was disqualified by the requirement of N.D.C.C. § 16–04–20(4) that a new party candidate wishing to appear on the ballot as a party representative earn a ballot position by submitting 15,000 signatures by June 1 of the election year. McLain was able, however, to qualify as an independent, non–party candidate by complying with N.D.C.C. § 16–03–02, submitting 300 supporting signatures not less than forty days before the general election. He was opposed by nominees of the Democrat and Republican Parties and by another independent, Don J. Klingensmith, who represented an organization known as "National Statesman."

Two weeks before the 1978 election, McLain first viewed the ballot which would be used.[4] He thereafter registered with the North Dakota Secretary of State his complaint that each independent candidate had not been given a separate column on the ballot. Upon obtaining no satisfaction,

2. These statutes, referred to herein for convenience as the "third party access" statute, the "incumbent first" statute, and the "independent column" statute, provide in pertinent part:
    N.D.C.C. § 16–04–20 (1971 Repl.) [Third Party Access]:
    The following political parties shall be provided with separate columns on primary election ballots:
    1. The Republican party;
    2. The Democrat party;
    3. Any party which cast five percent of the total votes cast for governor at the last general election; and
    4. *Any other party, if a petition signed by fifteen thousand or more electors of this state is filed with the secretary of state before four o'clock p. m. on June first of any primary election year, asking that a column be provided for such party, naming it, and stating the platform principles thereof. If such petition is mailed it shall be in the possession of the secretary of state before four o'clock p. m. on June first.* Candidates of such party shall be entitled to the same rights and privileges as those of other parties.
    (Emphasis added)
    N.D.C.C. § 16–11–06 [Incumbent First]:
    The [general election] ballot provided for in section 16–11–05 shall be arranged as follows: The names of the candidates of the party casting the highest number of votes in the state for members of Congress at the last preceding general election shall be arranged in the first or left–hand column of such ballot; of the party casting the next highest number of votes in the second column; of the party casting the next highest number of

votes in the third column; and of such other party as the secretary of state may direct for state officers.
    N.D.C.C. § 16–11–05 [Independent Column]:
    The official ballots provided for in this title for partisan election at general elections in precincts in which machines are not used shall be prepared as follows:
    1. The ballots shall be of sufficient width to contain all of the tickets to be voted for, under the appropriate party designation for each;
    2. On the left–hand side of such ballot shall be a column designating the office to be voted for, and on the same line, in the column under the appropriate party designation of each, all of the names of the candidates duly nominated for that office shall be printed;
    3. The names of candidates under headings designating each official position shall be alternated on the official ballot in the printing in the same manner as is provided in the primary election ballot;
    4. *The names of all persons nominated by petition shall be placed in one column under the designation of "independent nominations" in the lines respectively specifying the offices for which they are nominated.*
    (Emphasis added)

3. No contention is made on this appeal that registration with the Commission entitled McLain to a position on the primary ballot as a party candidate.

4. The contested ballot is reprinted in part as Appendix A to this opinion.

McLain filed a pro se complaint one day before the election in which he sought declaratory, preliminary and permanent injunctive relief, including prevention of the election the next day. The district court denied preliminary injunctive relief and the election was held, with McLain receiving 1.5% of the votes cast.

The defendants in this case, the Secretary of State for North Dakota and the State Attorney General (hereinafter "the State"), subsequently moved to dismiss McLain's complaint for failure to state a claim upon which relief could be granted. The district court, after considering the motion and various exhibits, on December 28, 1978 rendered what amounted to a summary judgment in favor of the defendants. On appeal this court vacated the district court's decision and remanded the case for further proceedings, specifying that the district court should permit a clarifying amendment of McLain's pro se complaint so as to draw North Dakota statutes §§ 16–04–20 and 16–11–05 clearly into the controversy. *McLain v. Meier*, 612 F.2d 349 (8th Cir. 1979).

With the aid of counsel, on remand McLain filed an amended complaint which was followed by additional discovery and a hearing in district court. Ultimately, the district court again entered judgment, accompanied by an as yet unpublished opin-ion, dismissing McLain's complaint. *McLain v. Meier*, No. A78–3075 (D.N.D. July 15, 1980). [*McLain v. Meier*, 496 F.Supp. 462 (D.N.D.1980)]

McLain appeals the judgment of dismissal pursuant to 28 U.S.C. § 1291.[5]

## A. The Ballot Access Statute: N.D.C.C. § 16–04–20(4).

The North Dakota access statute, N.D. C.C. § 16–04–20(4), provides a single method of ballot access for a "new" political party. Such a party may field candidates designated as its nominees "if a petition signed by fifteen thousand or more electors of this state is filed with the secretary of state before four o'clock p. m. on June first of any primary election year." N.D.C.C. § 16–04–20(4).[6] The record shows that 15,-000 signatures are nearly 3.3% of North Dakota's electorate. The filing deadline of June 1 is more than ninety days before the primary election[7] and more than one hundred fifty days before the general election.[8]

The district court found that these filing requirements did not have a "real and appreciable impact on the exercise of the franchise," *McLain v. Meier, supra,* at 468, *citing Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). In the absence of a substantial burden on the fundamental rights of voting and political asso-

---

**5.** We have held that the fact that the election has taken place does not render the controversy about the constitutionality of North Dakota's election laws moot. *McLain v. Meier, supra,* 612 F.2d at 355. Regardless of McLain's candidacy in any future election, election law controversies tend not to become moot. *See Storer v. Brown,* 415 U.S. 724, 737 n.8, 94 S.Ct. 1274, 1282 n.8, 39 L.Ed.2d 714 (1974); *MacBride v. Exon,* 558 F.2d 443, 447 (8th Cir. 1977); *Lendall v. Bryant,* 387 F.Supp. 397, 399 (E.D. Ark.1975). Such controversies are "capable of repetition, yet evading review." *Storer v. Brown, supra, citing Rosario v. Rockefeller,* 410 U.S. 752, 756 n.5, 93 S.Ct. 1245, 1249 n.5, 36 L.Ed.2d 1 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 332 n.2, 92 S.Ct. 995, 998 n.2, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

**6.** Any party which obtained 5% of the votes cast for governor in one election is automatically entitled to a column on the ballot in the next election. N.D.C.C. § 16–04–20(3). Republican and Democrat parties also have a right to separate columns on the ballot and are given automatic access. N.D.C.C. § 16–04–20(1) and (2). By contrast, a party which has not previously fielded candidates can gain access to the ballot only by satisfying the requirements of § 16–04–20(4).

McLain has challenged only the requirements of § 16–04–20(4), which pertain to a "new" party. He does not argue that the access provisions of § 16–04–20(1), (2) and (3) are unconstitutional.

**7.** *See* N.D.C.C. § 16–04–01 (primary election is on the first Tuesday in September).

**8.** *See* N.D.C.C. § 16–06–01 (general election is on the first Tuesday after the first Monday in November).

ciation, the court reviewed the access statute under the rational basis standard, and concluded that the access requirements were rationally related to the state's legitimate objective of avoiding confusion, deception and frustration of the democratic process. The district court observed that the State's objectives were served by requiring a showing of support before printing the name of a political organization's candidate on the ballot.

Ballot access statutes are not susceptible of easy analysis, nor is the appropriate standard of review always easy to discern. *See, e. g., Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188–90, 99 S.Ct. 983, 992–994, 59 L.Ed.2d 230 (1979) (opinions of Blackmun, J., concurring, and Stevens, J., concurring in the judgment); *Rosario v. Rockefeller, supra,* 410 U.S. at 767, 93 S.Ct. at 1254 (Powell, J., dissenting); *Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252, 1261 n.5 (9th Cir. 1978), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979). However, our reading of decisional law in this area leads us to conclude that the district court erred both as to the appropriate standard of review and as to the merits of the access statute.

■ The district court correctly noted that statutes affecting the right to vote must cause a discrimination "of some substance" before the compelling state interest test is triggered. *American Party of Texas v. White*, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); *see also Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *McDonald v. Bd. of Election Comm'rs. of Chicago*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). However, this burden of proof has not been difficult to meet because "voting is of the most fundamental significance under our constitutional structure" and requires jealous protection. *Illinois State Bd. of Elections v. Socialist Workers Party, supra*, 440 U.S. at 184, 99 S.Ct. at 990. We have noted in the past that access restrictions must be reasonable, must be justified by reference to a compelling state interest, and may not go beyond what the state's compelling interests actually require, *MacBride v. Exon, supra*, 558 F.2d at 448, because the fundamental right to vote is inseparable from the right to place the candidate of one's choice on the ballot.

■ Accordingly, we cannot avoid a hard and realistic review of North Dakota's access statute, in which we "consider the facts and circumstances behind the [access] law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Storer v. Brown, supra*, 415 U.S. at 730, 94 S.Ct. at 1279, *citing Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) and *Dunn v. Blumstein, supra*, 405 U.S. at 335, 92 S.Ct. at 999. *See also Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (remanding for further findings regarding the burden imposed on independent candidates, as determined by such variables as the time allowed for collection of signatures, the pool of potential signers, the filing deadline, and the experience of past candidates). Under this exacting standard of scrutiny, we conclude that North Dakota's access restrictions are unnecessarily oppressive, and hence unconstitutional.

■ Admittedly, argument can be made that North Dakota's 3.3% signature requirement is valid. *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding 5% signature requirement); *Rock v. Bryant*, 459 F.Supp. 64 (E.D.Ark.), *aff'd mem.*, 590 F.2d 340 (8th Cir. 1978) (upholding signature requirement of 3% of qualified electors or 10,000, whichever is less). However, the number of signatures required by North Dakota is significantly higher than that required in most states. *See Williams v. Rhodes, supra*, 393 U.S. at 47 n.10, 89 S.Ct. at 19 n.10; *Storer v. Brown, supra*, 415 U.S. at 739 n.10, 94 S.Ct. at 1283 n.10; *Developments in the Law—Elections*, 88 Harv.L.Rev. 1111, 1124 n.11 (1975).[9] The Supreme Court has spoken on

**9.** The footnote in *Williams* indicates the signatures required for third–party candidacy in various states as of 1968, as follows:

at least one occasion of 1% of the vote for governor as "within the *outer* boundaries of support the State may require before according political parties ballot position." *American Party of Texas v. White, supra,* 415 U.S. at 783, 94 S.Ct. at 1307 (emphasis added).

Moreover, as is evident from the Supreme Court's analysis in *Mandel v. Bradley, supra,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199, the facial validity of a signature requirement is but one indication of the constitutionality of a state's access provisions. As we indicated in *MacBride, supra,* 558 F.2d at 449, and as has been recognized in other contexts, *American Party of Texas v. White, supra,* 415 U.S. at 785, 94 S.Ct. at 1308; *Rock v. Bryant, supra,* 459 F.Supp. at 73–74, the time at which nominating petitions are filed can have an equal if not greater impact on the viability of third party candidacy.

North Dakota's filing deadline of June 1, more than ninety days before the primary election and more than one hundred fifty days before the general election [10] is particularly troublesome. While voters are not required to exercise their franchise or participate in the political process within the framework of organized political parties, most voters in fact look to third party alternatives only when they have become dissatisfied with the platforms and candidates put forward by the established political parties. This dissatisfaction often will not crystalize until party nominees are known. *See* in this connection *Storer v. Brown, supra,* 415 U.S. at 758, 94 S.Ct. at 1292 (Brennan, J., dissenting); *MacBride v. Exon, supra,* 558 F.2d at 449 n.6; *Lendall v. Bryant, supra,* 387 F.Supp. at 402. Accordingly, it is important that voters be permitted to express their support for independent and new party candidates during the time of the major parties' campaigning and for

some time after the selection of candidates by party primary. *E. g., American Party of Texas v. White, supra,* 415 U.S. at 784, 788, 94 S.Ct. at 1309 (approving Texas election law, under which new parties are entitled to compete before the primary, to count signatures at a party convention on primary day and to make up any shortage in signatures for fifty–five days after the primary; independent candidates must file within thirty days after the run–off primary election); *Jenness v. Fortson, supra,* 403 U.S. at 433–34, 91 S.Ct. at 1971–1972 (approving Georgia law under which independent candidates file nominating petitions on the same deadline that a candidate filing in a party primary must meet); *Rock v. Bryant, supra,* 459 F.Supp. at 66, 66 n.2, and 73 (approving the filing deadline for nominating petitions by independent candidates one day before the preferential primary; Arkansas law "[did] not work to require plaintiff ... to solicit signatures and thereby evidence support for his candidacy in a political vacuum or at a time when the campaign issues have not yet crystalized").

In the present instance, North Dakota's filing deadline more than ninety days in advance of the primary election impresses us as unnecessarily removed from the time of the major parties' most active campaigning. We have previously noted that a filing deadline ninety days in advance of the primary requires a third party candidate to qualify at a time when the individual's candidacy may be purely potential and contingent upon developments that may occur months later. *MacBride v. Exon, supra,* 558 F.2d at 449; *see also Anderson v. Celebrezze,* 499 F.Supp. 121 (S.D.Ohio 1980) (75–day preprimary deadline is unconstitutional). Given North Dakota's relatively high signature requirement, the North Dakota ballot access scheme in its totality [11] is particularly questionable.

| Signatures Required as a Percent of Electorate | Number of States |
|---|---|
| De minimis to 0.1% | 16 |
| 0.1% to 1% | 26 |
| 1.1% to 3% | 3 |
| 3.1% to 5% | 4 |

**10.** *See* nn. 7, 8, *supra.*

**11.** The concept of "totality" is applicable ... in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.
*Storer v. Brown, supra,* 415 U.S. at 737, 94 S.Ct. at 1282.

■ We decline to find, as the State urges, that the early filing deadline for third *party* candidates is offset by a later filing deadline for independent candidates.[12] A candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process. As the Supreme Court has recognized, "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer v. Brown, supra,* 415 U.S. at 745, 94 S.Ct. at 1286. The Constitution requires that the access requirements as to both party–backed and independent candidates be reasonable.

Finally, our decision is influenced by the experience of other third party groups, which has not been particularly happy in North Dakota. In *Storer v. Brown, supra,* the Supreme Court suggested that the experience of a "reasonably diligent ... candidate" is a helpful if not unerring guide to the constitutionality of access requirements. "[I]t [is] one thing if independent candidates have qualified *with some regularity* and quite a different matter if they have not." 415 U.S. at 742, 94 S.Ct. at 1285 (emphasis added).

Here, the record shows that third parties have not qualified for ballot position in North Dakota with regularity, or even occasionally. The American Party is apparently the only third party to field party candidates in the past three decades. By affidavit in the record on appeal, it is reflected that the American Party's successful petition drive in 1976 was an exhausting, even crippling effort, and that a second petition drive is beyond the resources of the group. Especially telling is the statement of the American Party affiant that "[i]n order to obtain 15,000 signatures, you have to contact many, many more than that number of people in order to obtain the required number," and that approximately 1,500 man hours are needed to obtain 15,000 signatures.

■ In sum, it seems clear to us that North Dakota's access requirements go beyond what is required by the State's valid interest in the effective functioning of the electoral process. The State may understandably and properly seek to prevent the clogging of its election machinery with frivolous, fraudulent or confusing candidacies. *Storer v. Brown, supra,* 415 U.S. at 732, 733, 94 S.Ct. at 1280. However, as the Supreme Court has noted, no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required. *Williams v. Rhodes, supra,* 393 U.S. at 33, 89 S.Ct. at 11. The remote danger of multitudinous fragmentary groups cannot justify an immediate and crippling effect on the basic constitutional right to vote for a third party candidate. Accordingly, we reverse the judgment of the district court upholding as constitutional North Dakota's ballot access requirements.

### B. The Incumbent First Statute: N.D.C.C. § 16–11–06.

McLain's next two contentions involve the treatment of independent, as opposed to party–backed, candidates on North Dakota's general election ballot. Appellant concedes that independent candidates have fair access to the ballot but alleges that they are disadvantaged by their placement on it.

---

**12.** Certificates of nomination for *independent* candidates must be filed with the secretary of state forty days before the general election, pursuant to N.D.C.C. § 16–05–03. By contrast, as noted, *supra* n.2, petitions to obtain a party column for a new *party* candidate on the primary ballot must be filed more than ninety days before the primary and more than one hundred twenty days before the general election. N.D.C.C. § 16–04–20(4). It appears that North Dakota is willing to encourage minority political voices, but only if they are partially stripped of a legitimizing party label.

The first statutory provision challenged by McLain, N.D.C.C. § 16–11–06, reserves the "first or left–hand column" of the ballot for the party which received the most votes in the last congressional election, the second column for the party with the next greatest number, and so forth. Thus, the political party which captures North Dakota's congressional race in one election is listed first in *all* races in the next election. Independent candidates are not mentioned in the law and thus are relegated to the last column.

McLain perceives in this ballot format the problem of the "donkey" vote, less insultingly known as the capricious or indifferent vote. He alleges that if all other factors are equal, the undecided or uninformed voter will be drawn to the name appearing first on the ballot. McLain contends that in a close election, victory may in fact turn on the windfall vote which accompanies an advantageous ballot position.[13]

The effect of ballot placement on voting is a matter of fact. Accordingly, we turn first to the question whether the district court's finding on this matter was clearly erroneous within the meaning of Fed.R. Civ.P. 52(a). The district court found an inference that some advantage may accrue to the candidate whose name appears first, relying primarily on the affidavit of an expert statistician for McLain, who reviewed various studies and concluded that there is "a definitive statistical advantage accruing to a candidate whose name appears first . . . on an election ballot . . . an advantage of at least five (5) percent." No contrary evidence was introduced.

■ The State contends that the district court's finding was erroneous because two [14] of the four studies relied upon by McLain's expert dealt with non–partisan rather than partisan elections. We cannot agree, particularly as our review is limited to the question whether the district court's conclusion was clearly erroneous. Two of the studies relied upon by McLain's expert remain unassailed, and we have been presented with no empirical studies tending to show that there is not a positional bias in the North Dakota ballot.[15] Moreover, as the Seventh Circuit has noted, the probative value of the cited studies is not completely dissipated merely because the studies are not perfectly suited to the facts of this case. *Sangmeister v. Woodard, supra*, 565 F.2d at 466. In concluding that there was no error in the district court's finding of ballot advantage in the first position we are not the first so to hold. *Weisberg v. Powell*, 417 F.2d 388, 392–93 (7th Cir. 1969); *Culliton v. Bd. of Election Comm'rs. of the County of DuPage*, 419 F.Supp. 126 (N.D.Ill.1976), *aff'd in part and remanded in part sub nom. Sangmeister v. Woodard*, 565 F.2d 460 (7th Cir. 1977), *cert. denied and app. dismissed sub nom. Illinois State Bd. of Elections v. Sangmeister*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978); *Gould v. Grubb*, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337 (1975); *Holtzman v. Power*, 313 N.Y.S.2d 904, 62 Misc.2d 1020, *aff'd mem.*, 34 App. Div.2d 917, 311 N.Y.S.2d 824, *aff'd mem.*, 27 N.Y.2d 628, 313 N.Y.S.2d 760, 261 N.E.2d 666 (1970); *Kautenburger v. Jackson*, 85

---

**13.** We are impressed by the figures introduced to suggest the ramifications of ballot advantage in recent North Dakota races. In 1974 a United States Senate seat from North Dakota was won by a margin of only 186 votes out of 235,661 votes cast, or less than .08%. Similarly in 1970, North Dakota's House seat was won by a margin of only 528 votes, or about .5% of the votes cast.

**14.** Scott, *California Ballot Position Statutes: An Unconstitutional Advantage to Incumbents*, 45 So.Cal.L.Rev. 365 (1972) and H. Bain and D. Hecock, Ballot Position and the Voter's Choice (1957).

**15.** We are aware from the summary of evidence in other cases that there are studies which question the finding of positional bias. *E. g., Sangmeister v. Woodard*, 565 F.2d 460, 466 n.12 (7th Cir. 1977), *cert. denied and app. dismissed sub nom. Illinois State Bd. of Elections v. Sangmeister*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978); *Clough v. Guzzi*, 416 F.Supp. 1057, 1063–64 (D.Mass.1976). We note also the problems in this data. *Sangmeister, supra*, 565 F.2d at 466 n.12; *Clough, supra*, 416 F.Supp. at 1064. On the other hand, many studies report a finding of some ballot advantage in the top position. *See Sangmeister v. Woodard, supra*, 565 F.2d at 465 n.3, 465 n.8, and 466 n.9.

Ariz. 128, 333 P.2d 293 (1958); *Elliott v. Secretary of State*, 295 Mich. 245, 294 N.W. 171 (1940).

However, a finding that advantage accrued to the incumbent party on the 1976 North Dakota ballot does not end our inquiry. The unequal effect flowing from the ballot design gives rise to the equal protection question whether the inequality is such as offends the fourteenth amendment.

The standard of review which applies to this question is anything but clear, particularly because the placement of candidates on a ballot does not involve absolute exclusion. Thus, although ballot format has an effect on the fundamental right to vote, the effect is somewhat attenuated. In these circumstances, most courts have applied the rational basis test. *Krasnoff v. Hardy*, 436 F.Supp. 304 (E.D.La.1977); *Clough v. Guzzi, supra*, 416 F.Supp. at 1067; *cf.* Seventh Circuit analysis requiring a showing of "intentional or purposeful discrimination by authorities" and actual disadvantage, *Bd. of Election Comm'rs. v. Libertarian Party of Illinois*, 591 F.2d 22, 24–25 (7th Cir.), cert. denied, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979), *citing Bohus v. Bd. of Election Comm'rs.*, 447 F.2d 821 (7th Cir. 1971), and *Sangmeister v. Woodard, supra*, 565 F.2d 465.

■ In the present case, we find that North Dakota's "incumbent first" statute does not withstand even this minimal standard of review, because the justification offered for North Dakota's ballot arrangement is unsound. The district court, *citing Bd. of Election Comm'rs. v. Libertarian Party, supra*, 591 F.2d at 27, reasoned that North Dakota has an interest in making the ballot as convenient and intelligible as possible for the great majority of voters. This justification virtually admits that the state has chosen to serve the convenience of those voters who support incumbent and major party candidates at the expense of other voters. Such favoritism burdens the funda-

mental right to vote possessed by supporters of the last-listed candidates, in violation of the fourteenth amendment. For this reason, we join the numerous other courts which have held "incumbent first" ballot procedures to be constitutionally unsound. *Netsch v. Lewis*, 344 F.Supp. 1280 (N.D.Ill. 1972); *Gould v. Grubb, supra*, 14 Cal.3d 661, 122 Cal.Rptr. 377, 536 P.2d 1337; *Holtzman v. Power, supra*, 313 N.Y.S.2d 904, 62 Misc.2d 1020; *see also Sangmeister v. Woodard, supra*, 565 F.2d 460 (placing Republicans first is unconstitutional); *Weisberg v. Powell, supra*, 417 F.2d 388 (intentional manipulation of ballot placement by Secretary of State so as to give certain candidates first placement is unconstitutional); *Culliton v. Bd. of Election Comm'rs., supra*, 419 F.Supp. 126 (placing Republicans first is unconstitutional); *Mann v. Powell*, 333 F.Supp. 1261 (N.D.Ill.1969) (unconstitutional to break ties for ballot position so as to favor incumbents); *Kautenburger v. Jackson, supra*, 85 Ariz. 128, 333 P.2d 293 (alphabetical listing unconstitutional). The few decisions favoring or declining to decide the validity of incumbent first provisions involve evidentiary considerations which do not apply here. *E. g., Bd. of Election Comm'rs. v. Libertarian Party, supra*, 591 F.2d 22 (no showing that two tier ballot was designed to favor major parties); *Clough v. Guzzi, supra*, 416 F.Supp. 1057 (plaintiff failed to prove a substantial advantage in first ballot position alone); *Ulland v. Growe*, 262 N.W.2d 412 (Minn.), cert. denied sub nom. *Berg v. Growe*, 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978) (expert testimony was inconclusive as to advantage of placing party candidates ahead of independents and positional bias was justifiable under rational basis standard).

## C. *The "Independent Column" Statute: N.D.C.C. § 16–11–05(4).*

McLain's final challenge to North Dakota's ballot design involves N.D.C.C. § 16–11–05(4), which allots party candidates their own column on the ballot while grouping all

independent candidates together in one column. The effect, according to McLain, is to make independents appear as mere bit performers on a stage dominated by two "stars," the Republicans and Democratic party candidates.

■ Although the issue may be close, we conclude on the present record that North Dakota's provision of a single column for independent candidates meets the rational basis test. *Socialist Workers Party v. March Fong Eu*, 591 F.2d 1252, 1261 (9th Cir. 1978), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2167, 60 L.Ed.2d 1049 (1979); *Krasnoff v. Hardy, supra*, 436 F.Supp. at 308.[16] This result is in accord with the overwhelming majority of cases approving various forms of disparate treatment for independent and party candidates, respectively. *Bd. of Election Comm'rs. v. Libertarian Party, supra*, 591 F.2d 22 (approving two–tier ballot with established political parties on top and "new" political parties on bottom); *Ihlenfeldt v. State Election Bd.*, 425 F.Supp. 1361 (E.D.Wis.1977) (approving single column for all candidates who qualified for the ballot by nomination papers and separate columns for other candidates); *Krasnoff v. Hardy, supra*, 436 F.Supp. 304 (approving the placement of party lever over major party columns while no party lever was provided for nomination paper candidates); *Voorhes v. Dempsey*, 231 F.Supp. 975 (D.Conn.1964), *aff'd*, 379 U.S. 648, 85 S.Ct. 612, 13 L.Ed.2d 552 (1965) (approving mandatory party lever); *Voltaggio v. Caputo*, 210 F.Supp. 337 (D.N.J.1962), *app. dismissed*, 371 U.S. 232, 83 S.Ct. 325, 9 L.Ed.2d 494 (1963) (approving top ballot placement for political party candidates and lower placement for those who qualified for

ballot by petition); *Ulland v. Growe, supra*, 262 N.W.2d 412 (approving placement of party candidates ahead of independent candidates).

Our affirmance of the decision of the district court is based not only on the weight of this authority, but also on additional considerations. First, there is little support for McLain's belief that the ballot design diminishes in any substantial way the status of independent candidates. The affidavit of McLain's expert statistician addresses only the effect of top placement on the ballot. By contrast, there is evidence to support the State's contention that the grouping of independents is necessary to maintain a manageable ballot. The record shows that in 1976 there were eleven candidates listed on the ballot for President, and it is not unreasonable to conclude that an eleven–column ballot would be unwieldy. The State has a legitimate interest in avoiding such a ballot by grouping independents in a single column.

Second, we note that the independent column may serve to identify those candidates who have not demonstrated the modicum of support required for qualification as a party candidate.[17] Insofar as the independent column may serve this informational purpose, the provision of such information is within the State's legitimate interests. As the court in *Ihlenfeldt v. State Election Bd., supra*, noted in a strikingly similar case:

> [The State] has chosen to accommodate the numerous candidates representing minority parties or principles by placing them in a column headed "Independent." This designation is not one of party or principle affiliation. It is purely organi-

16. The cited cases and others, mentioned *infra*, have reviewed linedrawing between independent candidates and party candidates under the rational basis test. We accept the rational basis standard as the appropriate level of review for the simple reason that the fundamental right to vote is somewhat remotely implicated. McLain does not contend that the independent column impedes independent voters from locating their candidate on the ballot.

17. Party candidates include the nominees of the Republican and Democrat parties, any party which cast five percent of the total votes cast for governor in the last general election and any party registering 15,000 signatures with the secretary of state. N.D.C.C. § 16–04–20. Independent candidates are those qualifying for a ballot position by submission of a nominating petition with 300 signatures. N.D.C.C. § 16–03–02.

zational in nature and is designed as a catchall for candidates whose parties have not been able to evidence the modicum of support necessary to merit a separate party column on the ballot. To insure that the candidates listed under the Independent heading are able to project a political identity to the electorate, Wisconsin permits them to identify themselves in five words or less. This format does not deny the plaintiff equal protection of the law; it insures his access to the electorate in as meaningful a way as possible.

425 F.Supp. at 1364.

Let it be clear that we are not saying that single column grouping is the only permissible arrangement of names of independents, or, indeed, that it is the best arrangement. There are many ways to accommodate a number of candidates and still treat all relatively fairly. For example, all candidates could be listed in one column on a rotating basis.

Within constitutional limits, however, the ballot arrangement of independent candidates is a matter of choice for the State and, as indicated, on the record before us we hold that North Dakota's single column arrangement is constitutionally permissible.

## II. Relief

The final problem before the court is that of fashioning relief. From what has been said, it follows that declaratory relief should have been granted with respect to "ballot access" and "incumbent first" issues.

We have mentioned the importance of the interplay between the statutory signature requirement and the filing deadline and we will add, perhaps gratuitously, that a relatively high signature requirement may be constitutionally acceptable when coupled with an opportunity to approach voters for signatures at a date less remote from the general election and at which date the major parties' activities may have crystalized the issues. *American Party of Tex-*

*as v. White, supra*, 415 U.S. at 784, 94 S.Ct. at 1307.

In similar vein we note that the fairest remedy for a constitutionally defective placement of candidates would appear to be some form of ballot rotation whereby "first position" votes are shared equitably by all candidates. Our preliminary research suggests that the most effective rotation system is one which rotates names from one ballot to the next. However, due to cost and efficiency factors and voting machine design, this system has proved difficult to implement. *See Culliton v. Bd. of Election Comm'rs., supra*, 419 F.Supp. at 129 n.7; *cf. State ex rel. Roof v. Bd. of Comm'rs. of Hardin County*, 39 Ohio St.2d 130, 314 N.E.2d 172, 177–81 (1974) (finding precinct by precinct rotation unconstitutional under state constitution and suggesting machine–by–machine rotation); *Note, Position of Candidates' Names and Special Designation on Ballots: Equal Protection Problems with the Massachusetts Election Law*, IX Suffolk U.L.Rev. 694, 713–15 (1975). In any case, we do not now undertake on this record to determine which rotation arrangement is financially and administratively feasible, although we feel obliged to stress the constitutional requirement that position advantage must be eliminated as much as is possible.

■ At oral argument appellant admitted that he would not attempt to qualify as a party candidate in the November, 1980 election and we are not advised that he has qualified or expects to qualify as an independent. Thus, so far as any party plaintiff in the case now before us may be concerned, no injunctive relief is necessary either as to access or placement issues.

■ Since the general election is less than a month away, we have no hope that either the North Dakota Legislature or the district court on remand could devise and put into effect an interim procedure for placement on the November, 1980 ballot. Therefore, reluctantly we must conclude

that practically speaking no injunctive relief is available for the 1980 election.

Generally speaking, ballot requirements and procedures within constitutional limits are primarily the responsibility of the State, and we have no reason to believe the State of North Dakota will not promptly address the questions of ballot access and ballot placement for elections subsequent to November, 1980. We do not deem it appropriate to undertake at this juncture to dictate to the Legislature the full extent to which its election statutes should be amended if they are to be constitutionally tolerable or to specify precise terms of new enactments. There are options and initially the State has the choice of the options it may select.

If new legislation is enacted there will be time enough for its validity to be determined judicially.[18] Of course, if the State does not act and if it undertakes to enforce the statutes as now written, injunctive relief may be necessary. But that can be done within the framework of another lawsuit.

In sum, we reverse the judgment of the district court in part and affirm in part. The denial of relief as to the third party access statute, N.D.C.C. § 16–04–20(4), and as to the incumbent first statute, N.D.C.C. § 16–11–06, is reversed and the cause remanded for award of declaratory relief consistent with this opinion. As indicated, McLain needs no permanent injunctive relief and his prayer therefor should be dismissed without prejudice. The judgment of the district court as to the independent column statute, N.D.C.C. § 16–11–05(4), is affirmed.

---

**18.** Appellant advises in his brief that voters in North Dakota will decide in November, 1980 whether to amend § 16–04–20(4), and he invites us to address the question of the constitutionality of the proposed amendments. We decline the invitation.

CASS COUNTY

# GENERAL ELECTION BALLOT

To vote for a person whose name is printed on the ballot mark a cross (X) in the square at the right of the name of the person for whom you desire to vote. To vote for a person whose name is not printed on the ballot write or paste his name in the blank space provided for that purpose.

| NAME OF OFFICE | REPUBLICAN | DEMOCRAT | INDEPENDENT NOMINATIONS |
|---|---|---|---|
| REPRESENTATIVE IN CONGRESS . Vote for (ONE) Name Only | MARK ANDREWS | BRUCE HAGEN | HARLEY J. McLAIN (Chemical Farming Banned) <br> DON J. KLINGENSMITH (National Statesman) |
| STATE SENATOR 13th DISTRICT Vote for (ONE) Name Only | CLAYTON A. LODOEN | RAY METZGER | |
| MEMBERS HOUSE OF REPRESENTATIVES 13th DISTRICT Vote for (TWO) Names Only | DANNY OLSON <br> FLORENZ BJORNSON | ROY T. KRAJECK <br> L.E. BERGER | |
| PUBLIC SERVICE COMMISSIONER Vote for (ONE) Name Only | RICHARD "Dick" ELKIN | ROBERT E. "BOB" HANSON | |